Filed 10/30/25  P. v. German CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  LAMAR EUGENE GERMAN,  Defendant and Appellant. | D082871  (Super. Ct. Nos. MH116637, SCN363687) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

Lamar German appeals from an order committing him to the State Department of State Hospitals for an indefinite term under the Sexually Violent Predators Act (SVPA or the Act) (Welf. & Inst. Code,[1] § 6600 et seq.). He claims there was insufficient evidence presented at trial to allow the jury to conclude that he suffered from a mental disorder that made it likely he would commit sexually violent predatory offenses in the future if he were released into the community. We conclude the record contains ample evidence to support the jury's findings on these points. Accordingly, we affirm the civil commitment order.

## FACTUAL AND PROCEDURAL BACKGROUND

After the People petitioned to commit German under the SVPA in September 2019, a trial was conducted in August 2023. The jury was presented with evidence of one offense that qualified as a "sexually violent offense" under the statute (see §§ 6600, subd. (b), 6600.1), as well as several other sex offenses that German committed over the years. Jurors learned about German's personal background and his perspective on these sex offenses as related to psychologists who interviewed him while he was incarcerated. The prosecution and the defense both presented expert testimony as to whether German satisfied the statutory criteria to qualify as a sexually violent predator (SVP). We discuss this evidence in turn.

The qualifying offense was committed against 10-year-old Brittany H. in May 2002. Brittany reported that she went to a hotel room with some teenaged friends, and German was there. Brittany understood that German was 19 years old at the time, but he was really 17. They all drank some

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

2

alcohol. Brittany became drunk and fell asleep on the bathroom floor. After everyone else fell asleep, German came into the bathroom, held her arms down, and raped her. She cried, told him to get off of her, and tried to push him away. It was painful and she bled. She reported the offense to the police soon thereafter.

In June of that year, German approached J.W. at the mall. He told her he was 19 years old, worked as "an escort," and thought she was cute. She told him she was 14 years old. He asked her to hang out, and she agreed. They walked around Oceanside until nighttime, getting to know each other. Stopping on a porch near the beach, German asked J.W. to perform oral sex on him. She did so, although she did not want to. German then proceeded to have intercourse with J.W. She repeatedly told him to stop. He replied, " 'Don't tell me to stop,' " and continued. Afterwards, they were walking down opposite sides of the street when police officers stopped J.W. and asked what she was doing out there. She was visibly upset. The officers took her to the station, where she told them what happened.

For these offenses, the juvenile court found true that German committed a lewd act upon a child under 14 years of age (Brittany) (Pen. Code, § 288, subd. (a)) and that he had unlawful sexual intercourse with a minor (J.W.) (*id.*, § 261.5). He was committed to the California Youth Authority for more than eight years.

In July 2012, deputy sheriffs working with the Riverside County Anti-Human Trafficking Task Force investigated the potential kidnapping or trafficking of Tina T. Tina described her relationship with German as a three-year, on-and-off relationship beginning when she was 17 years old.[2] During the investigation, the deputies found a video on German's phone

---

[2] German variously referred to Tina as his girlfriend, fiancée, or wife.

3

depicting a "pity party." According to the deputies, a pity party is essentially a pimp trying to make "his prostitute" or victim feel ashamed and put her "in her place" when she does something wrong. Sometimes it is recorded and shared with other pimps or on social media. In this particular video, German calls Tina a prostitute and berates her for losing or stealing his money. German was arrested for pimping, pandering, and human trafficking, and pleaded guilty to pimping (Pen. Code, § 266, subd. (h)). He was sentenced to six years in prison for this offense.

In early 2016, German befriended Dolores G., and the friendship turned romantic. They saw each other about once a week for a few months, but their relationship was not exclusive. In August of that year, Dolores agreed to drive German out of town to visit his grandmother. Along the way, however, things changed. German took off his ankle monitor, threw it away, and broke his phone. They checked into a hotel, drank wine, and snorted a white powdery substance. At some point, Dolores fell asleep. She awoke to a man she did not know unzipping his pants in the room. Dolores was scared and asked German what was going on. He responded, "Shut up," and hit her in the face with her phone. After the man left, German told Dolores they needed to move hotels. She pleaded to go home but he refused.

At the second hotel, German told Dolores he recorded her "being with" several men while she was unconscious and threatened to send the videos to her family. He then demanded she perform oral sex on him. She did not want to, but he insisted, "Do it." She began, and then withdrew. He grabbed her by the hair and forced her to continue. She began again, and then ran from the room to an employee office, completely nude. A woman in the office called the police. Dolores was taken to the hospital, where a nurse examined

4

her and noted 68 injuries—bruises, scratch marks, scrapes, and swelling—all over her face and body.

When police interviewed German a few days later, he admitted he and Dolores drank alcohol, used methamphetamine, and had oral sex in the hotel. According to German, the oral sex was not to his satisfaction. He told her "he would get somebody that could do it better, and then she got upset and left the room." He denied hitting her, remarking that she "wasn't important enough to hit." German pleaded guilty to assaulting Dolores with a deadly weapon (Pen. Code, § 245, subd. (a)(1)). He was initially placed on probation, but probation was subsequently revoked and he was sentenced to four years in prison.

While he was incarcerated, German spoke to several psychologists. Regarding his prior sex offenses, German claimed that Brittany and J.W. looked older and the encounters were consensual. He described Brittany as "promiscuous" and "very tall." At another point, however, he denied that anything happened between them. As to Tina, he denied that he was "her pimp." And with respect to Dolores, he said, "The case was dropped. I was given assault. She claimed a whole lot. Once she sobered up, her whole amazing statement was caught in lies. The officer that took her statement said she hallucinated. The discovery speaks for itself. I had known her for years." German did not believe that he was a sex offender or that he needed treatment.

As to his personal background, German shared that he had a "good" home life and was not abused. But he was an angry and "wild" child. He began drinking alcohol and using marijuana daily at age 13; he was arrested for the first time around the same age. German had been in and out of

custody since then, spending no longer than three months at a time in the community.  As a result, he had minimal work experience.

German told the psychologists that he started working as a pimp at age 15 and worked as a male prostitute as well.  He claimed to have had more than 300 sexual partners in his life, and he participated in group sex on occasion.  Despite his frequent incarceration, German claimed to have had an eight-year relationship with a marine biologist, a three-year relationship with another woman, and a three-year, nonmonogamous marriage to Tina.

At trial, the People presented expert testimony from two psychologists: Dr. Preston Sims and Dr. Steven Lovestrand.  The experts reviewed police reports, probation reports, criminal history, prison records, and past psychological interviews.  Dr. Sims interviewed German in June 2019, but German declined to be interviewed by Dr. Lovestrand on multiple occasions.  The experts independently concluded that German met the criteria to qualify as an SVP.  They agreed that the lewd act offense against Brittany was a qualifying offense under the statute.[3]  Both experts diagnosed German with Antisocial Personality Disorder (ASPD).  Lovestrand additionally diagnosed German with narcissistic personality disorder, exhibitionist disorder,[4] alcohol use disorder, and marijuana use disorder.  As discussed in greater detail below, both experts concurred that German was likely to engage in sexually violent predatory criminal behavior in the future as a result of his ASPD.

---

[3]    Committing a lewd act upon a child under 14 years of age constitutes a sexually violent offense as a matter of law.  (§§ 6600, subd. (b), 6600.1.)

[4]    The jury was given some evidence that German masturbated in front of unsuspecting persons while committed to the California Youth Authority.  In his psychological interviews, German claimed that such behavior "was part of the culture" there.

The defense presented its own expert, Dr. Brian Holoyda. Dr. Holoyda reviewed similar materials, personally interviewed German in May 2023, and applied risk assessment tools to evaluate German's likelihood of reoffending. Based on the foregoing, Holoyda concluded that German did *not* qualify as an SVP. Although he similarly diagnosed German with ASPD, opioid use disorder, alcohol use disorder, and marijuana use disorder, Holoyda did not believe these disorders predisposed German to sexual violence. As to ASPD specifically, Holoyda opined the disorder "had relatively little to do with his history of sexual offending." He was not convinced that German's prior offenses involved sexual violence due to inconsistencies in the victims' accounts. He also found it significant that there were only a few alleged reports of sexual violence out of hundreds of sexual encounters that German had, and only a few sex offenses despite a lengthy criminal history.

The jury ultimately found that German was an SVP. The trial court committed him to the State Department of State Hospitals for treatment and confinement for an indefinite term.

## DISCUSSION

"The SVPA provides for the involuntary civil commitment of certain sex offenders before the end of their prison or parole revocation terms." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190, citing § 6601.) "In order to commit someone under the Act, the state must establish four conditions: (1) the person has previously been convicted of at least one qualifying 'sexually violent offense' listed in section 6600, subdivision (b) (§ 6600, subd. (a)(1)); (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and safety of others' (*ibid*.); (3) the mental disorder makes it likely the person will engage in future acts of sexually violent

7

criminal behavior if released from custody (*ibid*.); and (4) those acts will be predatory in nature." (*Walker*, at p. 190.) "Civil commitment can commence only if, after a trial, the trier of fact finds beyond a reasonable doubt that each of these four requirements is met." (*Ibid*.)

In the SVP context, " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) A person is considered "likely" to engage in sexually violent criminal behavior if they present "a substantial danger, that is, a serious and well-founded risk, of committing a sexually violent predatory crime if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988–989.) And " '[p]redatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

Here, German does not dispute that he was convicted of at least one qualifying sexually violent offense. Nor does he challenge the propriety of his ASPD diagnosis. Instead, he contends the evidence failed to show that his ASPD made it likely he would engage in sexually violent predatory criminal behavior in the future. He emphasizes that there is some difference of opinion among professional evaluators as to whether, or under what circumstances, someone with ASPD can qualify as an SVP. He also claims that his prior sexual offenses were neither forcible nor violent.

We review "the sufficiency of the evidence in SVPA cases under the same substantial evidence test used in criminal appeals. . . . 'In assessing the sufficiency of the evidence, we review the entire record in the light most

favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Orey* (2021) 63 Cal.App.5th 529, 560–561, citations omitted.) In reviewing factual determinations for substantial evidence, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) The same is true for expert testimony: "The credibility of the experts and their conclusions were matters resolved against defendant by the jury. We are not free to reweigh or reinterpret the evidence." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467.)

Here, the record amply supports the jury's determination that German met the SVP criteria. To be sure, all three experts acknowledged there had been some disagreement among SVP evaluators in California as to whether, or under what circumstances, an individual with ASPD alone could qualify as an SVP. This is because ASPD does not necessarily involve any sexual deviance. And in fact, most individuals in prison—40 to 60 percent of such individuals, by some estimates—meet criteria for ASPD.

The experts also agreed, however, that the consensus had shifted over the years. Now, most evaluators agree that someone with an ASPD diagnosis can qualify as an SVP depending on the circumstances of the individual case. As Dr. Sims explained, if an individual has ASPD and repeatedly commits sex offenses—even despite conviction and incarceration—it is reasonable to conclude that the disorder is expressed in a sexually deviant way in that individual. In other words, it predisposes that individual to criminal sexual behavior. In Dr. Lovestrand's terms, an individual with ASPD plus a pattern of sex offending, or a paraphilic disorder, or a substance abuse disorder can

9

meet the criteria. Dr. Holoyda similarly testified that someone with ASPD could qualify as an SVP provided there was evidence that their ASPD diagnosis was "very closely linked" to their history of sex offenses. Although Holoyda found that link missing in this case, Sims and Lovestrand both concluded that German's ASPD predisposed him to commit criminal sexual acts.

Dr. Sims explained that although ASPD is common among those incarcerated, only a very small fraction of people in prison have committed even one sex offense. Accordingly, not all people with ASPD are predisposed to commit criminal *sex* offenses. But in German's case, he had committed *three* sex offenses—against Brittany, J.W., and Dolores—which indicates that his ASPD causes him to take advantage of women and girls in a sexual manner. This sets him apart from "the ordinary person in prison." Using Brittany's case as an example, Sims highlighted evidence that German knew she was 10 years old, gave her alcohol, had intercourse with her while she was intoxicated, and then claimed, after adjudication, that the offense "never happened" and was "bullshit." From Sims's perspective, these behaviors were consistent with ASPD because they reflected a lack of concern for Brittany, taking advantage of her, and crass denial.

Dr. Lovestrand reasoned that German exhibited a "very, very high sex drive," noting he claimed more than 300 sexual partners in his life despite all his years incarcerated. German was evidently preoccupied with sex, and "it doesn't seem to . . . matter much whether the other person is interested in him. What matters is he finds a way to get sex." German displayed emotional impairment by continuing his offensive behavior even after the women and girls were saying no and stop, and were hurting and crying. And

he demonstrated volitional impairment by continuing to commit sex offenses even after conviction and incarceration.

Drs. Sims and Lovestrand also agreed that German was likely to commit sexually violent criminal behavior in the future based on the results of static and dynamic risk assessments—namely, the Static-99R, the Static-2002R, the VRS-SO, and the Stable-2007. The static tests considered such factors as German's age, relationship history, and criminal history. When Sims employed these tests, German scored a 10 on the Static-99R and the Static-2002R, meaning he had a well-above average risk of reoffending. Lovestrand found that German scored a nine on the Static-99R, which corresponded to the same risk category.

To evaluate dynamic risk factors, Dr. Sims used the VRS-SO, which accounted for such factors as sexual deviance and compulsivity, lack of insight into past offenses, substance use, and failure to participate in treatment. German scored a 40 on that test, again placing him in the well-above average risk category. Dr. Lovestrand used the Stable-2007 test, which assessed German's relationships, hostility toward women, lack of concern for others, impulsivity, problem-solving skills, sexual behaviors, and poor cooperation with supervision, among other factors. German scored a 20 on this test, which placed him in the 98th percentile of test takers.

Considering the static and dynamic tests together, Dr. Lovestrand determined that German had a "very high risk" of reoffending. Dr. Sims quantified German's likelihood of reoffending as a 65 percent risk of reoffending in five years, and 76 percent risk in 10 years.

Dr. Sims further opined that German's future sexually violent criminal behavior would be predatory. His opinion was based on the fact that German's past sex offenses were against one stranger (J.W.) and two casual

11

acquaintances (Brittany and Dolores).  In his view, "the best predictor of future behavior is past behavior."  Dr. Lovestrand agreed that, based on the relationships that German had with the victims of his past offenses, any future offenses would likely be predatory.

Certainly, there are many cases in which an individual is diagnosed with ASPD but is not predisposed to committing sexually violent offenses, or is not likely to commit such offenses in the future.  But here, the jury was provided with ample evidence from which it could reasonably conclude that German's ASPD *did* predispose him, and that there was such likelihood.

Finally, German's suggestion that his past sex offenses were neither forcible nor violent plainly lacks merit.  The jury was presented with evidence that German held Brittany down and raped her while she cried and bled.  He had sexual intercourse with J.W. despite her repeated pleas for him to stop.  And he hit Dolores in the face for refusing to perform sexual acts with a stranger, and later grabbed the back of her hair to force her to orally copulate him.  While the defense emphasized inconsistencies in the victims' accounts at trial, we do not reweigh or reevaluate this evidence on appeal.

## DISPOSITION

The order is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


RUBIN, J.

12